UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SARAH CHILCUTT,

        Plaintiff,

     v.

THE CITY OF WAUKEGAN, et al.,

        Defendants.

No. 19 CV 6732

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Aaron Chilcutt's wife called officers of the Waukegan Police Department to the apartment that she shared with her husband, concerned that he had attempted to commit suicide. Officers sent Chilcutt to a hospital for evaluation. Two weeks later, Chilcutt's wife called police again—this time about physical abuse—and Chilcutt was arrested pursuant to a warrant. While in the WPD jail, Chilcutt killed himself using a blanket. Chilcutt's daughter, Sarah Chilcutt, sues police officers and the City of Waukegan for failing to provide adequate medical treatment or to protect Chilcutt from himself. Defendants move for summary judgment. For the reasons that follow, their motion is granted in part and denied in part.

## I.   Legal Standards

Summary judgment is appropriate if the movants show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). I construe all facts and draw all inferences in favor of plaintiff, the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020) (citation omitted). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.    Facts

### A.    Initial Call to Police and Hospitalization

On October 7, 2017, Mandy Tumis called the Waukegan Police Department, worried that her husband, Aaron Chilcutt, was suicidal. [54-1] ¶¶ 1–2.[1] Officers Loyda Santiago and Rick Tabisz responded. *Id.* At Tumis and Chilcutt's apartment, Tumis told the officers that Chilcutt had been drinking, was suicidal, and that he had taken pills—Warfarin, Tylenol, and perhaps aspirin. *Id.* ¶¶ 3–4.[2] Tumis also told Santiago that Chilcutt had physically assaulted her, said that he was "tired of living and over his 'effing' life," and had attempted suicide in the past. [54-1] ¶ 4; [68] ¶ 4.[3]

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiff's response to defendants' joint Local Rule 56.1 statement, [54-1], and defendants' response to plaintiff's statement of additional facts, [68], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and ignore additional facts included in response to the asserted fact that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(e)(2); *see* [54-1] ¶¶ 11, 32–33, 36–37, 40, 43, 68, 71–72, 74, 76; [68] ¶¶ 6, 15–16, 24.

[2] According to Santiago's report, Tumis said that Chilcutt had taken a bottle of aspirin, twenty or more pills of Warfarin, and a lot of whiskey. [54-1] ¶ 8.

[3] Defendants' statements of fact related to domestic-violence accusations against Chilcutt are relevant. *See* [54-1] ¶¶ 11–13, 19–21, 26–27, 29–30, 33; Fed. R. Evid. 401. Plaintiff's

Chilcutt disputed his wife's account: he told Santiago that Tumis was lying, that he didn't take all of the pills that Tumis said he had taken, and that he wasn't suicidal. [54-1] ¶ 5.

Officer Santiago decided to transport Chilcutt to a hospital because Chilcutt had suicidal ideations and had taken pills in an attempt to commit suicide. [54-1] ¶¶ 6–7. Chilcutt agreed to go to the hospital but told officers that his wife was exaggerating about the pills he had taken. *Id.* ¶ 9. Chilcutt was transported in an ambulance, and Santiago drove Tumis separately. *Id.* ¶¶ 7, 10. In a conversation with a WPD trainee, Officer Tabisz said that officers took suicidal detainees seriously, even when they denied suicidal ideation, and that they would have Tumis come to the hospital to fill out an involuntary commitment form for Chilcutt. [68] ¶ 2; [56] at 08:19:15–08:20:25 (marked as Ex. 20).

Santiago encouraged Tumis to speak to Chilcutt's doctor, and to secure an order of protection against her husband. *See* [68] ¶ 5; [61] at 9:03:00–9:06:20. Santiago said that Chilcutt's aggressive behavior was a sign of psychosis, which Chilcutt's doctors needed to know about. *See* [68] ¶ 5; [61] at 9:04:00–9:06:20. Tumis said that she wanted to obtain an emergency order, but ultimately didn't complete the required paperwork. *See* [54-1] ¶ 11; [54-3] at 29–30; [59] at 14:24:00–14:27:00. In a domestic-violence victim statement, Tumis wrote that Chilcutt physically abused

---

Fourteenth Amendment claims depend on whether the officers' actions were objectively reasonable based on the totality of the circumstances. *See McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (inadequate care); *Kemp v. Fulton Cnty.*, 27 F.4th 491, 497 (7th Cir. 2022) (failure to protect). That the officers were aware of domestic-violence allegations against Chilcutt is relevant to the reasonableness of their actions.

her on a daily basis, and "threatens to kill himself and me weekly." [54-1] ¶ 12. Tumis completed an involuntary commitment petition, seeking to have Chilcutt admitted to the hospital. *Id.* ¶ 13. Tumis wrote that Chilcutt had been suicidal on multiple occasions, was aggressive, and physically assaulted her. *Id.*

Tumis spoke to a doctor about Chilcutt, who was admitted to the hospital "for medical reasons and a psychiatric evaluation." [54-1] ¶ 10. Officers Santiago and Tabisz were present when Chilcutt was involuntarily committed. [68] ¶ 3. According to a medical record, Chilcutt was drunk when he arrived at the hospital, didn't know why he was in the emergency department, and said that he had only taken two Warfarin and four Tylenol pills the previous night. [54-1] ¶ 14; [46-3] at 201. Chilcutt denied thoughts of suicide, and one of his doctors wrote that Chilcutt didn't show symptoms of depression and suicide. [54-1] ¶ 14; [46-3] at 201. But on another medical record, the same doctor wrote that Chilcutt needed to be involuntarily admitted, found that Chilcutt was in need of immediate hospitalization to prevent physical harm associated with mental illness, and noted that lab reports were inconsistent with Chilcutt's account of the pills he had taken. [54-4] at 2; *see* [54-1] ¶ 14. A second doctor wrote that Chilcutt's chief complaints were ingestion of Tylenol and Coumadin and potential suicide, that Chilcutt denied thoughts of suicide but had an elevated Tylenol level, and that in light of his suicidal ideation, "Psych" should clear him from the emergency department. [54-1] ¶ 15; [46-3] at 202; [68] ¶ 14; [54-20] at 3–4. Another medical record showed that Chilcutt's principal diagnosis was accidental poisoning by 4-aminophenol derivatives, with secondary diagnoses of (among other

4

things) accidental poisoning by anticoagulants and a history of self-harm. [54-1] ¶ 17; [46-3] at 203. Another doctor wrote that Chilcutt was at high risk due to overdoses and required further evaluation and treatment. [68] ¶ 15.

Chilcutt was discharged from the hospital on October 9. [54-1] ¶ 16. The doctor who completed the discharge paperwork diagnosed Chilcutt with (among other things) (1) Tylenol overdose, suicidal attempt ruled out, (2) history of suicidal attempts, and (3) history of depression and anxiety. *Id.* ¶ 16; [46-3] at 204. Chilcutt was repeatedly questioned about a possible suicide attempt, but denied any attempt to hurt himself. [54-1] ¶ 16; [46-3] at 204. Chilcutt said that he had taken extra doses of Tylenol to deal with pain from a cut on his finger. [54-1] ¶ 16; [46-3] at 204. Despite his denials, however, before October 7, Chilcutt had attempted to take his own life at least twice. [68] ¶ 16; [54-23] at 24–25. Chilcutt was sent home from the hospital and told to follow up with his primary care provider and to abstain from alcohol and cigarettes. [54-1] ¶ 18; [46-3] at 204.

On the same day that Chilcutt was discharged, Officer Maria Pantoja was assigned to investigate Tumis's domestic battery allegations. [54-1] ¶ 19. Pantoja spoke to Tumis, who said that she and Chilcutt had argued on the night of October 6 into the morning of October 7, and that Chilcutt had taken pills and overdosed. *Id.* ¶ 20. Tumis described the physical abuse that she suffered from her husband during that incident, but didn't tell Officer Pantoja that Chilcutt had been suicidal. *Id.* ¶¶ 20, 22. Tumis didn't want to press charges against Chilcutt, and didn't obtain an order of protection because she was concerned that it would affect her divorce process. *Id.*

¶ 20. On October 13, Pantoja met with a state's attorney, who approved charges against Chilcutt for aggravated domestic battery and two counts of domestic battery. *Id.* ¶ 21. Pantoja obtained a warrant for Chilcutt's arrest. *Id.* At the time Pantoja sought the warrant, she knew that Chilcutt had been hospitalized on October 7. *Id.* ¶ 23.[4]

## B.    Chilcutt's Arrest and Suicide

At some point after he was released from the hospital, Chilcutt returned to the apartment that he shared with Tumis. [54-1] ¶ 26. Tumis said that she had no choice but to allow Chilcutt to return, because if she refused he would have killed her. *Id.*

On October 21, Tumis and her husband had another fight. [54-1] ¶ 27. According to Tumis, Chilcutt had been drinking for a day and a half, and would not let Tumis go to sleep or to the bathroom alone. *Id.* Chilcutt passed out, and Tumis drove to a nearby gas station and called the police. *Id.* ¶ 28. She told the dispatcher that there was a warrant for Chilcutt's arrest, and that she needed officers to arrest her husband because Tumis wasn't safe. *Id.* ¶ 29.

---

[4] To show individual liability under § 1983, plaintiff must allege that each of the individual defendants was personally involved in the constitutional deprivation. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019) (citing *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)). Personal involvement means (1) participating directly in the alleged violation; (2) knowing about the conduct; (3) facilitating the conduct; (4) approving the conduct, condoning it, or turning a blind eye to it. *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) (citations omitted). Plaintiff failed to respond to defendant Pantoja's argument that she was not personally involved in the alleged constitutional deprivation, and forfeited any argument in opposition to Pantoja's motion for summary judgment. *See* [54]; *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020). The facts show that Pantoja was never aware that Chilcutt posed a risk to himself and wasn't personally involved in the choices that allegedly violated his Fourteenth Amendment rights. *See* [54-1] ¶¶ 19–25. Summary judgment is granted to Pantoja.

Officers Tabisz, Santiago, and Kelly Gordon met Tumis at the gas station. [54-1] ¶¶ 29–31. At the time, both Santiago and Tabisz remembered Chilcutt's October 7 hospitalization, but Gordon didn't learn about that incident until after October 21. [54-1] ¶ 46; [68] ¶ 6. Tumis gave the officers the keys to her apartment. [54-1] ¶ 30. Tumis said that she and Chilcutt had been drinking and arguing, but didn't tell officers anything about Chilcutt's mental health. *Id.* ¶¶ 32, 36. Officer Tabisz didn't ask Tumis if Chilcutt was suicidal or if he had taken any pills, but did remind Tumis that Chilcutt had been involuntarily committed. *Id.* ¶ 32; [56] at 14:40:35–14:40:55 (marked as Ex. 9). Tumis told Santiago that Chilcutt was drunk, that she was scared, and that the only reason she had called for help was because Chilcutt was threatening to kill her. [54-1] ¶ 33; [46-2] at 129–30.[5] Tumis later said that she didn't call the police because Chilcutt was suicidal, but rather because she wanted to save her own life and couldn't handle the abuse any longer. [46-3] at 181, Dep. at 37–38; [54-1] ¶ 30.

The officers decided to arrest Chilcutt pursuant to the warrant. [54-1] ¶ 34; [68] ¶ 1. They entered Chilcutt and Tumis's apartment, and found Chilcutt on a couch. [54-1] ¶¶ 35, 52. The officers told him that they had a warrant for his arrest, and Chilcutt responded that nothing had happened between him and Tumis. *Id.* ¶¶ 35, 51. Chilcutt was calm, compliant, and acted in an ordinary way at the time of

---

[5] Plaintiff fails to controvert the asserted fact. *See* [54-1] ¶ 33. The cited portion of Tumis's deposition testimony doesn't support the proposition that Tumis called 911 because Chilcutt was intoxicated and angry. *See* [54-3] at 36–38. Tumis felt that she didn't have a choice except to call the police, and (in answer to a question about whether Chilcutt was suicidal on October 21) said that he was intoxicated and angry. *See id.*

the arrest, *id.* ¶¶ 35–36, 51–52,[6] and didn't say anything about being suicidal. *Id.* ¶ 37; [46-2] at 133. The officers placed Chilcutt in a squad car and Santiago transported him to the police department. [54-1] ¶¶ 35, 51.[7]

Officer Santiago brought Chilcutt to the booking room at the WPD jail, where officers Gordon and Tabisz were waiting. [54-1] ¶ 38. Tabisz asked Santiago whether she wanted to place Chilcutt in a holding cell or a regular cell at the WPD jail, and Santiago responded that it would probably be better to put him in a "holding cell so that we can get him right out for booking." [59] at 15:15:01–15:15:10; *see* [68] ¶ 8. While ordinarily the officer who transported a detainee to the jail (here Santiago) was supposed to complete a detainee screening/receiving form, Gordon completed that form for Chilcutt as part of the booking process. [54-1] ¶¶ 38–39. Gordon asked Chilcutt if he had any medical issues or was taking medication, and Chilcutt said no. [63] at 2:20–2:45; *see* [54-1] ¶ 42. Gordon didn't ask Chilcutt whether he had any mental health problems or was suicidal. [63] at 2:20–3:30; *see* [54-1] ¶ 42; [54-10] at 101.[8] The screening form had checkboxes to indicate that a detainee was

---

[6] That Officer Tabisz reminded Chilcutt that he had previously been taken to the hospital and asked whether Chilcutt had walked out of the hospital doesn't controvert the fact asserted: that Chilcutt was calm and wasn't erratic when he was arrested on October 21. *See* [54-1] ¶ 36; [59] at 14:57:00–14:57:25.

[7] Officers Santiago and Tabisz had a conversation about whether Tabisz should accompany Chilcutt. *See* [68] ¶ 7. Tabisz said that Chilcutt was "pretty cooperative," and Santiago agreed, but also said "who knows, you know, because the other day." *Id.*; [70] at 15:00:40–15:00:49.

[8] Gordon said that she asked Chilcutt the questions on the screening/receiving form, but the video evidence clearly shows that she didn't ask Chilcutt whether he had mental health conditions or was suicidal. *See* [54-1] ¶ 42; [54-10] at 125–26; [63] at 2:20–3:30; *Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021) (citation omitted) (When video evidence is clear,

"Suicidal/Self-Destructive," "Intoxicated," or had certain medical conditions (including "Mental Condition"). [54-1] ¶¶ 40–41; [54-26] at 2. Gordon didn't mark any of those boxes, but did check a box showing that Chilcutt was calm. [54-1] ¶ 40; [54-26] at 2.[9] Although Officer Santiago was present at the booking, she didn't give Gordon information to complete the screening form. [54-1] ¶¶ 47–48; [46-2] at 138–41. Santiago didn't provide Gordon with information about Chilcutt because she didn't know whether Chilcutt had any mental conditions, Chilcutt said he wasn't suicidal on October 7, and because Chilcutt didn't make any comments suggesting that he was suicidal on October 21. *See* [46-2] at 138–40; [54-1] ¶ 47.[10]

Gordon asked Chilcutt whom she should list as his emergency contact. [63] at 2:40–3:15; *see* [68] ¶ 10. Chilcutt named his wife, and Gordon asked if he had anyone else that he could designate. [63] at 2:40–3:15; *see* [68] ¶ 10. After apparently saying that there was no one else, Chilcutt said "I guess I can go and die." [63] at 2:40–3:15; *see* [68] ¶ 10.[11]

---

there can be no genuine factual dispute based on statements clearly contradicted by the footage).

[9] Gordon later couldn't recall being told that Chilcutt was drunk, [46-3] at 101; [54-1] ¶ 46, but on October 21 she did ask Chilcutt if he had been drinking. [63] at 11:00–11:10.

[10] Officer Santiago's general approach to screening forms—she testified that past suicidal behavior wasn't regularly included because a detainee could be suicidal on one day and not the next—doesn't controvert the asserted facts: the specific reasons that Santiago didn't provide information about Chilcutt to Gordon. *See* [54-1] ¶¶ 47, 77; [46-2] at 138–40.

[11] While the audio recording of Chilcutt's booking interview isn't entirely clear, it's reasonable to infer that Chilcutt said (and that the officers heard Chilcutt say) "I guess I can go and die" in response to Gordon's query about an alternative emergency contact. *See* [63] at 2:40–3:15. *Philebaum*, cited by the defense, is distinguishable, because the videotape and photographs at issue in that case didn't show the incident in question (an automobile accident), whereas the recording here captured Chilcutt's response to Gordon's question, and it's reasonable to infer—given the audio recording, Chilcutt's demeanor, and his subsequent suicide—that

Chilcutt was calm and cooperative during the booking process. *See* [54-1] ¶¶ 44–45, 49–50, 53.[12] There's a dispute as to whether the officers saw or heard anything that would suggest that Chilcutt was suicidal or had a mental condition on October 21: the officers said that Chilcutt didn't appear depressed and didn't say anything that would suggest he was at risk of harming himself, but it's reasonable to infer that the officers heard Chilcutt say "I guess I can go and die." *Id.* ¶¶ 44–45, 48–50; [68] ¶ 10. Chilcutt made a joke while waiting to be moved to a cell, but otherwise appeared muted and at one point told the officers that "I've got to find someone who cares to bond me out." *See* [54-1] ¶ 49; [63] at 2:20–3:30, 5:40–11:50.

The officers removed Chilcutt's shoelaces and the drawstring from his shorts. [68] ¶ 12; [54-1] ¶ 54.[13] Officer Santiago escorted Chilcutt to a regular jail cell (not a

---

Chilcutt said "I guess I can go and die." *See Philebaum v. Myers*, No. 1:04-CV-218-TS, 2006 WL 335518, at *11–12 (N.D. Ind. Feb. 13, 2006). Chilcutt's statement isn't hearsay, both because it is offered to show its effect on the listeners (and not for the truth of the matter asserted), *see United States v. Law*, 990 F.3d 1058, 1062 (7th Cir. 2021) (citation omitted), and because the statement was an expression of Chilcutt's emotional condition excepted from the hearsay rule. *See* Fed. R. Evid. 803(3). In addition to the video, plaintiff wants to rely on a transcript of the booking interview as evidence that Chilcutt made the statement in question, *see* [68] ¶ 10; [54-9] at 3, but plaintiff failed to disclose that transcript in response to defendants' interrogatories and requests for production. *See* [68] at 13–47. Because plaintiff hasn't shown that that failure was substantially justified or harmless, the transcript is excluded. *See* Fed. R. Civ. P. 37(c)(1); *Karum Holdings LLC v. Lowe's Companies, Inc.*, 895 F.3d 944, 951 (7th Cir. 2018) (citations omitted). Plaintiff also hasn't established through a competent witness that the transcript is accurate.

[12] While it's reasonable to infer that the officers heard Chilcutt say "I guess I can go and die," that doesn't controvert the asserted fact: that Chilcutt was calm and cooperative. *See* [54-1] ¶¶ 44–45, 49–50.

[13] An expert on jail operations wrote that officers Santiago and Tabisz had a heightened duty to protect Chilcutt because they were the same officers who responded to the October 7 call and knew of his potential suicide risk. [54-19] at 18; [68] ¶ 13. Because the existence and scope of defendants' duty to protect Chilcutt is a legal question that will determine the outcome of plaintiff's Fourteenth Amendment claim, this portion of the expert's report is inadmissible as a statement of the constitutional duty to protect. *See* Fed. R. Evid. 702; *DM*

holding cell). [54-1] ¶ 54; [68] ¶ 11.[14] At around 4:26 p.m., Chilcutt asked for a blanket and Santiago gave him one. [54-1] ¶ 54; [68] ¶ 12.[15] Officer Anthony Paulsen began his shift at the jail's front desk at 6:00 p.m. [54-1] ¶ 55. He let Chilcutt out of his cell to get a drink of water, and the two men had a brief conversation. *Id.* ¶¶ 55–56. Chilcutt was pleasant and polite, thanked Paulsen, and the two shook hands when Chilcutt returned to his cell. *Id.* ¶ 56.[16]

About a half hour later, Paulsen conducted a cell-check and found Chilcutt hanging in his cell, a blanket tied to the bars and wrapped around Chilcutt's neck. [54-1] ¶ 57. Paulsen radioed for assistance and retrieved the key to the cell. *Id.* ¶ 58. Paulsen and other officers attempted to revive Chilcutt, and Paulsen performed CPR until paramedics arrived. *Id.* Chilcutt was transported to a hospital where he was pronounced dead. *Id.*

---

*Trans, LLC v. Scott*, 38 F.4th 608, 620 n.3 (7th Cir. 2022) (citation omitted). I consider this portion of the report in a non-legal sense: as a statement about the experience of a reasonable police officer in defendants' position, and what they would infer about a detainee's suicide risk under similar circumstances. The jail operations expert also said that it was well known in the jail industry that detainees do not always vocalize their plans for self-harm, and that the detainees most at risk of suicide are newly arrived with current and past mental health problems and those who are intoxicated. [68] ¶¶ 18–19.

[14] Holding cells were used to house suicidal or self-destructive detainees (along with other types of high-risk detainees) at the jail. *See* [68] ¶ 9; [54-12] at 72–74; [54-14] at 83; [54-15] at 54. One WPD official said that the holding cell was used for suicidal detainees because it was easier to access and monitor. [68] ¶ 9; [54-15] at 53–55. The testimony cited by plaintiff doesn't show that the holding cell was *only* used for high-risk detainees. *See* [68] ¶ 9; [54-12] at 72–74; [54-14] at 83; [54-15] at 54.

[15] A jail operations expert said that Officer Santiago created a serious and substantial risk to Chilcutt's health by giving him a blanket. [68] ¶ 29.

[16] Officer Paulsen didn't hear or see anything that would suggest that Chilcutt was a suicide risk, and didn't know that Chilcutt had previously attempted suicide or had been hospitalized on October 7. [54-1] ¶¶ 59–60. Chilcutt was the only detainee in the men's section of the jail for most of his time in the facility. [68] ¶ 17.

C.      Policies, Training, and Practices

Waukegan Police Department general orders governed inmate handling during booking and detention. [54-1] ¶ 61. Some orders addressed the detection and prevention of detainee suicides, and required officers to complete a detainee screening form for each new detainee to determine whether they were at high risk of suicide or needed medical treatment. [46-4] at 97–101, 105–06, 115, 125–27, 129–30; [54-1] ¶ 62. Compliance with the general orders was mandatory, and the department ensured that its officers understood and followed general orders and policies through reviews, supervision, and answering officer questions. [54-1] ¶¶ 67, 75. But as plaintiff points out, there are examples where officer training differed in practice, and where WPD policies weren't always followed to the letter. *See* [54-1] ¶¶ 61–62, 65–66, 71–72, 75, 77–79.[17]

The officer who transported a detainee to the jail was required to fill out a detainee screening form. [54-1] ¶ 69. The officer using the screening form was to make inquiries as to a detainee's health and mental status, note any illnesses or risk factors, and document observations and inquiries into the detainee's psychological and medical condition. [46-4] at 154, Dep. at 78–79; *see* [54-1] ¶ 70. An officer in possession of information relating to a medical condition or security risk about a detainee had a responsibility to communicate that information to the officer

---

[17] Defendants' facts about the WPD general orders are uncontroverted insofar as they describe the existence and content of the department's written policies. *See* [54-1] ¶¶ 61–62, 65–66, 71–72, 75, 77–79. But by pointing to examples of non-compliant conduct and differences in officer training, plaintiff disputes that WPD policies were followed at all times and that all officers were trained in the same way. *See id.*

completing the form. [68] ¶ 34. A WPD supervisor said that he reviewed detainee screening forms primarily for completeness, not accuracy. *See* [68] ¶ 36; [54-13] at 51.

Gordon (who didn't transport Chilcutt to the jail) completed Chilcutt's detainee screening, but didn't ask Chilcutt about his mental health conditions or if he was suicidal. *See* [54-1] ¶ 42; [63] at 2:20–3:30. Gordon used a different form to screen Chilcutt than the template version attached to WPD general orders. [54-1] ¶ 70; [68] ¶ 31. *Compare* [46-4] at 103–04, 133–34 *with* [54-26] at 2. The template version included the questions "Are you being treated by a doctor for any problems psychological or physical?" "Have you ever attempted suicide?" and "Any thoughts of suicide now?" along with a check box in a "High Risk Detainee Screening" section for "Self Destructive/Suicidal." [54-25] at 2–3; [46-4] at 103–04, 133–34. The form that Gordon used for Chilcutt didn't include those questions, but did include a check box for "Suicidal/Self-Destructive" in a section called "High-Risk Detainee Screening." [54-26] at 2; [68] ¶ 31.[18] Regardless of which version of the form was used, the forms performed the same role in the booking process. *See* [54-1] ¶ 70; [46-4] at 155, Dep. at 84.[19]

---

[18] A WPD commander didn't recall the version of the screening form attached to the general orders being used, and couldn't remember how soon after the policy was drafted that a different form was implemented. [46-4] at 154, Dep. at 78; *see* [54-1] ¶ 70. Another WPD officer could not recall precisely why the template version attached to the general orders wasn't used during bookings. *See* [46-4] at 187, Dep. at 95–96. A jail operations expert said that the version of the form used for Chilcutt wasn't sufficient to adequately assess the health and safety risks posed by a new detainee. [68] ¶ 32.

[19] That the forms didn't collect precisely the same information, as several WPD officers acknowledged, *see* [54-10] at 49–51; [54-13] at 111–12, doesn't dispute the fact asserted: that the forms served the same purpose. *See* [54-1] ¶ 70.

If officers concluded that a detainee was suicidal, that fact should have been clearly marked on the screening form (by checking the "Suicidal/Self-Destructive" box) and on WPD paperwork, and an officer was required to notify a supervisor, who would then call an ambulance for assistance while the detainee remained under supervision. [54-1] ¶¶ 63–64, 71–72; [46-4] at 106, 126–27. Officers managing high-risk detainees were required to dress them in paper gowns, house them in the holding cell, transport them to a medial facility if necessary, and physically check on them every fifteen minutes. [54-1] ¶¶ 65–66.

Department policies required that a detainee condition alert form be completed for "any detainee who exhibits suicidal or self-destructive tendencies, is combative, violent, has received medical treatment while in custody, or [is] suffering from a mental disorder." [46-4] at 106; *see id.* at 101; [68] ¶ 30; [54-1] ¶¶ 65–66. A general order also required that the detainee condition alert form be completed for "[a]ny detainee with a known history of mental disorders or mental defects that leads an officer to believe he is a threat to himself or others, or who exhibits evidence of such condition." [46-4] at 126; *see id.* at 130; [68] ¶ 30. When a detainee condition alert form was used, the front desk officer and shift supervisor were to be informed, and the form itself was to be attached to a detainee's booking sheets, the cell check clipboard, and log. [54-1] ¶ 66.

No detainee condition alert form was completed for Chilcutt, [68] ¶ 30, and there's evidence that the form wasn't used or used consistently by all WPD officers. *See id.*; [54-1] ¶¶ 65–66. Officer Gordon never saw or used the detainee condition alert

14

form, [54-10] at 47, and Officer Tabisz said that he hadn't used the form either and couldn't recall being trained as to when the detainee condition alert form was to be used. [54-7] at 54. Officer Santiago couldn't remember using the form to mark that a detainee had previously attempted suicide or had mental health conditions. [54-11] at 55–56.

Officers were required to complete three to four months of field training, where they were given general orders along with other policies. [54-1] ¶¶ 73–74. The department used lecture, independent study, group discussions, online and hybrid modules, and role playing to train its officers. [68] ¶ 25. Training was tracked through acknowledgement that an email had been opened, signature forms, or records in online training platforms. *Id.*; [54-12] at 26–27.

Waukegan Police Department officers were trained—through crisis intervention, field, in-service, online, and on-the-job programming—to identify and protect mentally ill and suicidal detainees where possible. [54-1] ¶ 76; *see* [68] ¶ 26. The department's training coordinator couldn't remember the type of training officers received on the identification of mentally ill detainees before October 2017. [54-12] at 40–41; *see* [68] ¶ 26. Officers learned that blankets could be used to cause self harm through the WPD field training program, but weren't formally trained on that point. [54-14] at 96; *see* [68] ¶ 28.

To decide if a detainee had mental illnesses or was a danger to himself or others, officers were taught to ask detainees direct questions, use their own observations, and to consider their knowledge of detainee mental health history. [54-

15

1] ¶ 77. Warning signs included threatening statements or evidence of self-harm, along with past suicide attempts, hospitalizations, a diagnosis of mental illness, or prescriptions. *Id.* ¶ 78.[20] The identification of suicidal detainees was the culmination of WPD training, and ultimately turned on officer observations, statements and actions by a detainee, and other factors. *Id.* ¶ 79.

Officer Tabisz learned about the WPD's protocol for identifying suicidal arrestees through on-the-job training: when a suicidal arrestee arrived, a field training officer would explain the procedures and later debrief officers on the incident. [68] ¶ 20. Tabisz wasn't trained to follow up on erratic behavior or suicidal statements, but instead relied on his common sense to develop an assessment of a detainee's mental health status. *Id.* ¶ 21. Tabisz said that (when faced with a potentially suicidal detainee) he would determine whether the detainee had the means to hurt themselves, speak to the detainee, and consider the totality of circumstances. [54-7] at 20–21; *see* [68] ¶ 21.

Officer Santiago didn't recall being trained that information that a detainee was suicidal might be relevant to custody procedures, but also said that if an officer knew a detainee was suicidal during booking, the officer was supposed to take that individual to a hospital. [54-11] at 17; *see* [68] ¶ 22. Santiago said that a detainee's past suicidal behavior wouldn't necessarily decide whether they were suicidal at a later date, [68] ¶ 23; *see* [54-1] ¶ 77, and that even if she were aware of a detainee's

---

[20] Officer Gordon was trained to look for crying, certain answers to the screening form questions, comments about self harm, and violence or self harm as indicators of high risk or suicidal behavior. [54-1] ¶ 43.

previous suicide attempts, she would still decline to designate that detainee as suicidal if the detainee said that they weren't suicidal. [68] ¶ 33.

A WPD training coordinator didn't recall being trained that a history of suicide attempts was an indicator that a detainee may be suicidal. [68] ¶ 27.[21] Another coordinator said that "I guess I can go and die" was a suicidal statement that officers could have identified as a factor in deciding whether Chilcutt was suicidal. *Id.* ¶ 24. According to the WPD chief, that statement would have been a good indicator of a person's current state of mind. *Id.* One officer estimated that before October 2017 there had been between five and ten suicide attempts at the jail, and said that those earlier attempts involved either clothing or blankets. *Id.* ¶¶ 37–38. During the WPD deputy chief's twenty-seven year career, however, Chilcutt's was the only in-custody suicide at the jail. [54-1] ¶ 68.

## III. Analysis

### A. Fourteenth Amendment: Failure to Protect or to Provide Adequate Medical Care

Plaintiff brings two § 1983 claims, alleging that officers Santiago, Tabisz, and Gordon failed to protect Chilcutt from self harm and failed to provide him with adequate medical care. [1] ¶¶ 80–99. Because Chilcutt was arrested after a finding of probable cause but hadn't been convicted of any crime, *see* [54-1] ¶¶ 21, 34–35; [68]

---

[21] If WPD sought an involuntary commitment of a detainee at a hospital, they would include information about the detainee's suicidal statements, past suicide attempts, past hospitalizations for mental illness and self-harm, and any diagnosis of mental illness. [54-14] at 113–115; *see* [68] ¶ 35. The training coordinator didn't say that a detainee's past suicide attempts were *only* relevant after a decision had been made to bring a detainee to a hospital. *See* [54-14] at 113–15.

17

¶ 1, at issue are Chilcutt's Fourteenth Amendment rights. *See Jump v. Vill. of Shorewood*, 42 F.4th 782, 792–93 (7th Cir. 2022) (citations omitted); *Pulera v. Sarzant*, 966 F.3d 540, 549 (7th Cir. 2020) (citing *Currie v. Chhabra*, 728 F.3d 626, 629–30 (7th Cir. 2013)).

Jail and prison officials must take reasonable measures to guarantee the safety of detainees. *See Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Under the Fourteenth Amendment, the defendant officers' conduct is assessed using the objective reasonableness standard. *Jump,* 42 F.4th at 793 (citing *Pulera*, 966 F.3d at 550); *see Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject to the objective reasonableness inquiry); *Kemp v. Fulton Cnty.*, 27 F.4th 491, 495–97 (7th Cir. 2022) (extending the objective reasonableness test to failure-to-protect claims brought under the Fourteenth Amendment).

To prove that the officers failed to provide reasonable medical care, plaintiff must show that defendants acted purposefully, knowingly, or recklessly. *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353). If defendants were "aware that their actions would be harmful, then they acted purposefully or knowingly; if they were not necessarily aware but nevertheless strongly suspected that their actions would lead to harmful results, then they acted recklessly." *Pittman by and through Hamilton v. Cnty. of Madison*, 970 F.3d 823, 828 (7th Cir. 2020) (internal quotation marks omitted). Plaintiff must also show that the

18

challenged conduct was objectively unreasonable. *McCann*, 909 F.3d at 886 (quoting *Miranda*, 900 F.3d at 354). A court evaluating the reasonableness of medical care considers all of the facts and circumstances faced by the individual alleged to have provided inadequate care and, without considering the subjective beliefs held by that individual, whether the response was reasonable. *Id.*; *Jump*, 42 F.4th at 793 (citations omitted).[22]

A failure-to-protect claim requires a similar showing. Plaintiff must prove that (1) defendants made an intentional decision about the conditions of Chilcutt's confinement; (2) those conditions put Chilcutt at substantial risk of suffering serious harm; (3) defendants didn't take reasonable, available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious; and (4) the defendants, by not taking such measures, caused Chilcutt's injuries. *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (citing *Kemp*, 27 F.4th at 496).[23]

---

[22] In assessing the reasonableness of a response, relevant factors include (1) notice of the arrestee's medical need; (2) the seriousness of the medical need; (3) the scope of the requested treatment (balanced against the seriousness of the need); and (4) police interests, including administrative, penological, and investigatory concerns. *See Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 600 (7th Cir. 2011) (quoting *Williams v. Rodriguez*, 509 F.3d 392, 403–04 (7th Cir. 2007)) (applying the objective reasonableness test in the context of a Fourth Amendment medical-care claim); *Pulera v. Sarzant*, 966 F.3d 540, 552 (7th Cir. 2020) (citing *Williams*, 509 F.3d at 403) (discussing the factors in a case involving medical-care claims arising under either the Fourth or Fourteenth Amendments).

[23] The same four factors for assessing reasonableness may be relevant for failure-to-protect claims. *See Jump v. Vill. of Shorewood*, 42 F.4th 782, 795–96 (7th Cir. 2022) (Ripple, J., concurring in part and dissenting in part) (citations omitted) (applying the factors in the context of a failure-to-protect claim brought under the Fourth Amendment).

19

Defendants argue that they never had notice of a serious risk that Chilcutt would harm himself. *See* [46-5] at 10–11. While the precise standards for medical-care and failure-to-protect claims vary, notice of the risk or condition at issue is a requirement to show that officers acted unreasonably. *See Jump*, 42 F.4th at 793 (citing *Pulera*, 966 F.3d at 555) ("[W]hen an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions."); *Thomas*, 39 F.4th at 841 (quoting *Kemp*, 27 F.4th at 497 and citing *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 730 (6th Cir. 2022) and *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1072 (9th Cir. 2016)) (To prove the third element in a failure-to-protect claim, a plaintiff must show that each defendant was "on notice of a serious risk of harm" to the detainee, meaning that "a reasonable officer in a defendant's circumstances would have appreciated the high degree of risk the detainee was facing."); *see also Young v. Dart*, Case No. 17-cv-1914, 2021 WL 3633927, at *10–11 (N.D. Ill. Aug. 17, 2021) (gathering cases); *Bradford v. City of Chicago*, No. 16 CV 1663, 2021 WL 1208958, at *4–7 (N.D. Ill. Mar. 31, 2021) (citations omitted).

### 1. *Officers Tabisz and Santiago*

On October 21, Chilcutt's wife called WPD, seeking to have her husband arrested for domestic abuse. [54-1] ¶¶ 27–28. Tumis didn't tell the responding officers (Santiago, Tabisz, and Gordon) that she was concerned about Chilcutt harming himself, and at the time of his arrest and during his subsequent detention, Chilcutt was calm, cooperative, and acted normally. *See* [54-1] ¶¶ 32–33, 44–45, 49–50, 53. But Tabisz and Santiago knew that Chilcutt had been hospitalized for an apparent

suicide attempt two weeks earlier, that Chilcutt had denied attempting suicide, and that (according to Tumis) it was not Chilcutt's first attempt. [54-1] ¶¶ 1–6; [68] ¶¶ 4, 6. It's also reasonable to infer that in the WPD booking room on October 21, the officers heard Chilcutt say "I guess I can go and die" after failing to name an alternative emergency contact. [63] at 2:40–3:15; *see* [68] ¶ 10.

A non-idle threat of suicide by a detainee puts officers on notice of a substantial risk. *See Sanville v. McCaughtry*, 266 F.3d 724, 737–38 (7th Cir. 2001) (quotation omitted) (if a detainee told officers that he was suicidal, that alone should have been enough to impute awareness of a substantial risk); *Collins v. Seeman*, 462 F.3d 757, 761–62 (7th Cir. 2006); *see also Cavalieri v. Shepard*, 321 F.3d 616, 621–22 (7th Cir. 2003) (officer who was told by two other people that a detainee was at risk of suicide and knew that the detainee had been arrested for attempting to kill himself was on notice of a substantial risk); *Johnson v. Garant*, 786 Fed. App'x 609, 610–11 (7th Cir. 2019) (discussing *Sanville*, 266 F.3d at 737–38) (knowledge of a previous suicide attempt and other indirect indicators made a subsequent threat non-idle). But "[n]ot every prisoner who shows signs of depression ... can or should be put on suicide watch," and "scant comments" that don't convey a serious risk of suicide aren't enough to put an officer on notice. *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020) (quoting *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003)); *see Jump v. Vill. of Shorewood*, 42 F.4th 782, 793–94 (7th Cir. 2022); *see also Davis-Clair v. Turck*, 714 Fed. App'x 605, 606 (7th Cir. 2018) (citations omitted) (a threat of suicide at some unspecified time does not convey an imminent risk).

21

In this case, there's evidence that Tabisz and Santiago were aware of two signs that Chilcutt could be at risk of committing suicide on October 21. First, they knew that he had apparently made an attempt two weeks earlier. Second, they heard Chilcutt say "I guess I can go and die." That statement was vague and passive. But a jury drawing inferences in plaintiff's favor could conclude that it was a kind of suicidal threat, one that (when uttered by someone who credibly attempted suicide two weeks earlier) communicated a morbid depression and a non-idle intent to try again. *See* [68] ¶ 24 (A WPD training coordinator said that Chilcutt's statement indicated suicidal intent.). Chilcutt didn't use the word "suicidal." *Cf. Sanville v. McCaughtry*, 266 F.3d 724, 737–38 (7th Cir. 2001); *Collins v. Seeman*, 462 F.3d 757, 761–62 (7th Cir. 2006). But "I guess I can go and die" is not, as a matter of law, impossible to understand as a sufficient threat.

Based on what Tabisz and Santiago knew, reasonable officers in their position could have strongly suspected a serious risk of suicide. *See Hall v. Ryan*, 957 F.2d 402, 405 (7th Cir. 1992) (a detainee's agitated behavior on the night of his suicide attempt, combined with his past encounters with police officers including a suicide threat nine months earlier, could have put officers on notice of a serious threat of suicide); *Sanville*, 266 F.3d at 737–38 (knowledge of past suicide attempts, other indirect indicators, combined with statements of suicidal intent could have put officers on notice).[24] *Cf. Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020) (the

---

[24] There are factual distinctions between *Hall* and this case. *See Hall v. Ryan*, 957 F.2d 402, 402–05 (7th Cir. 1992). The detainee *Hall* acted erratically at a police station, and had a longer track record with a police department than Chilcutt did. *See id.* But *Hall* is relevant

absence of more or more significant indirect signs of suicide, combined with a detainee's express statement that he wasn't considering suicide, meant that an official wasn't on notice); *Jump v. Vill. of Shorewood*, 42 F.4th 782, 793–94 (7th Cir. 2022). Santiago and Tabisz failed to confirm the risk to Chilcutt by following up with him, but their failure to inquire further isn't grounds to avoid liability. *See Famer v. Brennan*, 511 U.S. 825, 843 n.8 (1994); *Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011).

That some of Chilcutt's doctors determined that he wasn't suicidal or depressed on or after October 7 doesn't show that the officers weren't on notice of a substantial risk two weeks later. There's no evidence that the officers knew what Chilcutt's doctors had concluded about their patient. *See* [54-1] ¶ 48. And the medical evidence itself was mixed—some of Chilcutt's doctors appeared more concerned about his risk of suicide—and none of Chilcutt's medical providers heard Chilcutt make a suicidal threat. *See* [54-1] ¶¶ 14–17; [68] ¶¶ 14–15.

Chilcutt's denial of suicidal ideation on October 7 doesn't decide the issue, either. There's evidence that both Tabisz and Santiago believed that a person who previously denied suicidal ideation could still be suicidal. *See* [68] ¶ 2; [56] at 08:19:15–08:20:25 (marked as Ex. 20); [54-1] ¶ 77; [46-2] at 138–40. Apparently crediting Tumis's account (or erring on the safe side), Santiago decided to transport Chilcutt to the hospital despite Chilcutt's denial. [54-1] ¶¶ 6–7. Most importantly,

---

and persuasive because it shows that previous suggestions of suicidal intent, combined with present, circumstantial evidence, can put an officer on notice of a serious risk. *See id.*

23

Chilcutt's denial came two weeks before he was arrested and made what officers could have understood to be a suicidal threat. *Cf. Pulera*, 966 F.3d at 551 (a detainee denied present thoughts of suicide during an intake screening, less than two days before attempting suicide). Chilcutt never denied feeling suicidal on October 21, perhaps because he was never asked. *See* [63] at 2:20–3:30; [54-1] ¶ 42; [54-10] at 101.

This case isn't like *Pulera*. In *Pulera*, an officer who knew that a detainee (1) said that two family members had both recently committed suicide, (2) was taking medication for depression, and (3) expressly denied considering suicide, in the "absence of more or more significant indirect signs" wasn't on notice of a substantial risk to the detainee. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020). Here, Chilcutt never denied feeling suicidal on October 21, made a statement that could have been understood as a suicidal threat, and Tabisz and Santiago were aware of another significant, indirect sign that Chilcutt might be a risk to himself: a hospitalization for a potential suicide attempt two weeks earlier.[25]

Defendants only challenged plaintiff's § 1983 claims on the basis of inadequate notice. *See* [46-5] at 9–11; [67] at 1–10. Officers Santiago and Tabisz aren't entitled to judgment as a matter of law because what they knew about the risk of suicide in

---

[25] The other cases cited by defendants are also distinguishable. The detainees in *Novack*, *McKinney,* and *Bradford* never made a comparable statement to the defendants in those cases suggesting suicidal intent and the *McKinney* detainee repeatedly denied suicidal ideations in the months before committing suicide. *See Est. of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000); *McKinney v. Franklin Cnty., Illinois*, 417 F.Supp.3d 1125, 1132–35 (S.D. Ill. 2019); *Bradford v. City of Chicago*, No. 16 CV 1663, 2021 WL 1208958, at *5–6 (N.D. Ill. Mar. 31, 2022). The *Jump* detainee told officers during a screening on the night of his suicide that he wasn't suicidal. *Jump v. Vill. of Shorewood*, 42 F.4th 782, 787 (7th Cir. 2022).

this case depends on disputed facts and inferences. Considering what they could have understood as Chilcutt's suicidal threat and the officers' knowledge of a recent, potential suicide attempt, a jury could conclude that Tabisz and Santiago were aware of a serious risk that Chilcutt might harm himself. A jury could conclude otherwise, but a genuine material dispute remains as to whether these officers violated Chilcutt's Fourteenth Amendment rights.

2.      *Officer Gordon*

It's reasonable to infer that Officer Gordon heard Chilcutt say "I guess I can go and die," [63] at 2:40–3:15; *see* [68] ¶ 10, and also "I've got to find someone who cares to bond me out." *See* [54-1] ¶ 49; [63] at 5:40–11:50. Unlike her colleagues, however, Gordon didn't know that Chilcutt had been hospitalized for an apparent suicide attempt two weeks earlier. [54-1] ¶ 46.

Gordon had no context for Chilcutt's statements: no signs that Chilcutt was at risk of harming himself. *See Pulera v. Sarzant*, 966 F.3d 540, 553–54 (7th Cir. 2020) (a concern about dying, expressed to a nurse who didn't know a detainee's mental health history, did not put the nurse on notice of a suicide risk); *Bradford v. City of Chicago*, No. 16 CV 1663, 2021 WL 1208958, at *5 n.6 (N.D. Ill. Mar. 31, 2021) (a detainee's statement that "my life is done," made to a detective apparently unaware of other indicators of suicide risk, didn't put the detective on notice). Officer Gordon encountered a calm, compliant detainee, one who made a joke while in the booking room, but also made some comments suggesting that he felt sad or uncared for. Without the context that her colleagues had, Gordon couldn't have understood

25

Chilcutt's statement to be a serious threat of suicide, and no jury could find that she had notice of a substantial risk that Chilcutt would take his own life. *See Jump*, 42 F.4th at 793 (citing *Pulera*, 966 F.3d at 555); *Davis-Clair v. Turck*, 714 Fed. App'x 605, 606–07 (7th Cir. 2018) (citations omitted). Based on the totality of the circumstances that Gordon faced on October 21, she had no reason to think that Chilcutt was serious about harming himself, and cannot be faulted for failing to take his off-hand comment as a firm statement of intention.

### 3. *Qualified Immunity*

Qualified immunity shields officials from civil liability with the exception of "the plainly incompetent or those who knowingly violate the law." *Lovett v. Herbert*, 907 F.3d 986, 991 (7th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Once a qualified immunity defense is raised, the burden shifts to the plaintiff to show (1) a violation of a constitutional right and (2) that the constitutional right was clearly established at the time of the alleged violation. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017)). To prove that a right was clearly established, a plaintiff can (1) identify a reasonably analogous case that articulates the right at issue and concerns a similar set of facts, or (2) demonstrate that the violation was so obvious that a reasonable person would necessarily have recognized that it violated the law. *Id.* at 701–02 (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017)); *Est. of Escobedo v. Bender*, 600 F.3d 770, 779–80 (7th Cir. 2010) (citations omitted).

26

Plaintiff points to violations of Chilcutt's Fourteenth Amendment rights to adequate medical care and protection from self harm. [54] at 14–15. There's no dispute that in 2017, Chilcutt had a clearly established right to be free from deliberate indifference to the risk of suicide while in custody. *See* [67] at 11; [54] at 15–16; *Minix v. Canarecci*, 597 F.3d 824, 830–31 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018) (citations omitted).

Officer Gordon wasn't on notice of Chilcutt's risk of suicide, which means that she didn't violate Chilcutt's rights. *See Jump v. Vill. of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022) (citation omitted); *Thomas v. Dart*, 39 F.4th 835, 841–42 (7th Cir. 2022) (citations omitted). Gordon is entitled to qualified immunity. *See Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). Summary judgment is granted to defendant Gordon, on both the merits and the defense of qualified immunity.

As discussed above, a jury could conclude that Tabisz and Santiago violated Chilcutt's Fourteenth Amendment rights. Defendants argue that those rights were defined in 2017 by the deliberate indifference standard (as opposed to objective reasonableness), and that the earlier standard requires plaintiff to show that defendants had actual knowledge of a substantial risk of serious harm, meaning that they were aware of facts from which one could infer a substantial risk and that they actually drew that inference. *See* [67] at 10–12; *Pittman ex. rel. Hamilton Cnty. of Madison, Ill.*, 746 F.3d 766, 775–76 (7th Cir. 2014) (explaining the deliberate indifference standard); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 350–54 (7th Cir. 2018)

(extending the objectively unreasonable standard to Fourteenth Amendment medical-care claims).

Although *Miranda* probably changed the standard for plaintiff's claims, that doesn't help defendants. It was clearly established in October 2017 that acting with deliberate indifference to a substantial risk of a detainee's suicide violated the Constitution. *See Pittman*, 746 F.3d at 775–76; *Minix*, 597 F.3d at 831 (citation omitted). Plaintiff has shown that Santiago and Tabisz knew that Chilcutt had potentially attempted suicide on October 7 and it's reasonable to infer that they heard Chilcutt make a suicidal threat two weeks later. A jury considering that evidence could conclude that Santiago and Tabisz had actual knowledge of the substantial risk that Chilcutt could kill himself—that they drew the required inference. A jury must decide whether they did, in fact, draw that inference, or whether they made reasonable mistakes about the risks Chilcutt was facing or about the legality of their actions. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations omitted) (the protection of qualified immunity applies to reasonable mistakes of law or fact); *Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 200–07 (2001)).[26]

---

[26] While qualified immunity for Tabisz and Santiago cannot be decided now because it turns on contested facts, the issue remains one of law for the court to decide. *See Taylor v. City of Milford*, 10 F.4th 800, 812 (7th Cir. 2021) (citing *Est. of Escobedo v. Martin*, 702 F.3d 388, 398 n.4 (7th Cir. 2012) and quoting *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)); *Smith v. Finkley*, 10 F.4th 725, 749–50 (7th Cir. 2021). Should this case proceed to trial, a specific jury verdict form may be useful to probe the facts related to qualified immunity, including whether Santiago and Tabisz had actual knowledge of the substantial risk to Chilcutt or whether they made a reasonable mistake that led to a violation of Chilcutt's rights. *See Taylor*, 10 F.4th at 812 (citing *Smith*, 10 F.4th at 749–50).

There are genuine factual issues as to whether Tabisz and Gordon violated Chilcutt's clearly established rights or made reasonable mistakes covered by qualified immunity. Summary judgment is denied as to the § 1983 claims against Tabisz and Gordon.

### B. *Monell*

Local governments acting under color of state law are liable for constitutional torts arising from their policies or customs. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 616–17 (7th Cir. 2022) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 (1978) and *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789–96 (7th Cir. 2014)). *Monell* liability is tough to prove. *Id.* at 617 (citation omitted); *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020). Municipalities are on the hook only for their own violations of the Constitution and federal law, and cannot be held vicariously liable for the constitutional torts of their employees or agents. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021); *J.K.J.*, 960 F.3d at 377 (citations omitted).

To prove her *Monell* claim, plaintiff must first trace the deprivation of a federal right to an action taken by the City of Waukegan. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021); *LaPorta*, 988 F.3d at 986–87. Municipal action can take the form of (1) an express policy, (2) a widespread practice or custom, or (3) an action by someone with final policymaking authority. *Stockton*, 44 F.4th at 617 (citations omitted); *J.K.J.*, 960 F.3d at 377 (citing *Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017)). Second, plaintiff must show that

the City's action constituted deliberate indifference, a high bar. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Third and finally, plaintiff must offer evidence that the City's action was the moving force behind the constitutional injury: a showing of a direct causal link. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (citation omitted).

Plaintiff doesn't claim that the City took an affirmative action—through an unconstitutional policy, for instance—that violated Chilcutt Fourteenth Amendment rights. *See* [54] at 16–22; *J.K.J.*, 960 F.3d at 378; *Woodward v. Corr. Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). Instead, her *Monell* claim centers on inaction: gaps in the WPD's policies (and in the enforcement of those policies) and the City's failure to properly train its officers. [54] at 16–22.

Because plaintiff is claiming that the City didn't directly inflict an injury, but instead caused an employee to do so indirectly, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *J.K.J.*, 960 F.3d at 378 (quoting *Brown*, 520 U.S. at 405); *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675–66 (7th Cir. 2022). To prove that the City took an action in this case, plaintiff must show that the City had notice that the gaps in its policies or the failure to train were likely to cause constitutional violations. *See Bohanon*, 46 F.4th at 677 (quoting *J.K.J.*, 960 F.3d at 379); *see also Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (quotation omitted).

Typically, to show that a risk of constitutional violations was a "known or obvious" risk, a plaintiff offers evidence of an earlier pattern of similar constitutional

30

violations. *J.K.J.*, 960 F.3d at 380 (citing *Brown*, 520 U.S. at 410). Plaintiff argues that such a pattern exists here because before Chilcutt's suicide there had been between five and ten suicide attempts involving clothing or blankets in the WPD jail. *See* [54] at 21–22; [68] ¶¶ 37–38; [54-1] ¶ 68. But the fact that other detainees had attempted suicide at the jail, standing alone, isn't enough to show an earlier pattern of similar violations. *See Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766, 780 (7th Cir. 2014) ("The bare fact that other inmates attempted suicide does not demonstrate ... that officials were aware of any suicide risk posed by the [jail's] policies."); *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985).

The path to *Monell* liability isn't entirely blocked without a pattern of earlier violations, but only a narrow route remains. To succeed on such a claim, plaintiff must show that the City of Waukegan's knowledge of the risk of constitutional violations can be inferred from the obviousness of the consequences of failing to act. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 677 (7th Cir. 2022) (citing *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 380 (7th Cir. 2020)). In the rare case when notice can be shown in this way, the risk must have been so high as to reflect deliberate indifference, and to allow an inference of institutional culpability. *Id.* (citing *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021)); *J.K.J.*, 960 F.3d at 380 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Plaintiff points to a long list of alleged failures with the City's training and enforcement of its policies. *See* [54] at 18–22. Under a failure-to-train theory, plaintiff first takes issue with the form of some WPD training, noting that some officers

31

learned about the suicide protocol informally or on-the-job. [54] at 18–19.[27] But the source of officer training, on its own, doesn't say anything about its quality. Similarly, that the WPD sometimes tracked its officers' learning through acknowledgement that an email had been opened, *see* [68] ¶ 25; [54-12] at 26–27, isn't evidence of shoddy programming, or that officers didn't complete the training. WPD officers relied in part on detainee statements to identify suicide risks (despite the well-known fact that suicidal detainees don't always vocalize their plans), but that fact doesn't show that their training was insufficient, either, especially because officers were also taught to look at many other factors. *See* [54-1] ¶¶ 77–79; [68] ¶ 18.

Plaintiff relies on the accounts of various officers, but this evidence doesn't reflect deliberate indifference to suicide-prevention training. For instance, while a WPD training coordinator couldn't recall being trained that a history of suicide attempts was an indicator that a detainee may be suicidal, [68] ¶ 27, other officers were taught that past attempts were a warning sign for suicide. *See* [54-1] ¶¶ 77–79. Officer Santiago didn't remember being trained that information about a detainee's suicide risk could be relevant during booking. *See* [54-11] at 17; [68] ¶ 22. But Santiago knew that suicidal detainees were to be brought to the hospital, and didn't say that she had never been trained on the WPD's suicide protocols. *See* [54-11] at 17. Santiago's position that a detainee could be suicidal one day without being suicidal

---

[27] Some of the WPD's training was informal, and one officer said that he relied on common sense (rather than training) to decide how to follow up on erratic behavior or suicidal statements. *See* [68] ¶¶ 20–21, 26, 28; [54-12] at 40–41; [54-14] at 96.

the next, *see* [68] ¶ 23, didn't run afoul of any WPD policy, and plaintiff hasn't shown how that statement would lead to constitutional violations.

What's left of plaintiff's failure-to-train theory? Just the facts of Chilcutt's case. Two WPD officers said that "I guess I can go and die" was a suicidal statement or a good indicator of a person's state of mind. [68] ¶ 24. Plaintiff implies that because officers Gordon, Tabisz, and Santiago didn't take Chilcutt's statement that way, their training must have been inadequate. *See* [54] at 18–19. Assuming the officers heard the statement, their failure to identify or respond to Chilcutt's real intention was an isolated incident on this record, and isn't evidence of a systematic breakdown that might have put the City on notice of a problem. *Cf. Woodward v. Corr. Medical Services of Illinois, Inc.*, 368 F.3d 917, 927–28 (7th Cir. 2004) (a lack of training wasn't an isolated incident when multiple employees testified about a lack of training and leadership knew about and permitted a related, dangerous practice).

Plaintiff argues that the WPD's policies don't represent the reality at the department, because officers either didn't understand the rules or disregarded them. [54] at 19–22. The strongest piece of evidence on this "policy gap" *Monell* theory is that multiple officers didn't use or know how to properly use the WPD's detainee condition alert form, which wasn't completed for Chilcutt. *See* [68] ¶ 30; [54-1] ¶¶ 65–66; [54-10] at 47; [54-11] at 55–56. It's also true that officers used a version of the detainee screening form that wasn't attached to the general orders, and that the version used for Chilcutt didn't include two suicide-specific questions that were included in the template. *Compare* [46-4] at 103–04, 133–34 *with* [54-26] at 2. A jail

operations expert said that the version of that document used to screen Chilcutt was insufficient, *see* [68] ¶ 32, but that (less-detailed) form still prompted officers to inquire about a detainee's suicide risk. *See* [54-26] at 2. Finally, plaintiff has shown that Officer Santiago wasn't on the same page with WPD leadership and policies about how to handle information about a detainee's past suicide attempts at booking. *See* [68] ¶¶ 23, 33–34; [54-1] ¶¶ 77–79.

Waukegan Police Department practice didn't always live up to policy. It's troubling that some officers appeared unaware of or uneducated about the department's detainee condition alert form, which was intended to identify high-risk detainees. *See* [46-4] at 101, 106; [68] ¶ 30; [54-1] ¶¶ 65–66. But there's no evidence that leadership at the department condoned or permitted officers to stop using that form, *cf. Woodward*, 368 F.3d at 927–28, and plaintiff hasn't shown why the failure to use the detainee condition alert form was likely to lead to constitutional violations. Even without using the detainee condition alert form, officers still screened detainees for suicide risk (albeit using a different, less detailed document), and they were trained to identify and care for suicidal detainees.[28]

To show that the City of Waukegan took an action in this case, plaintiff needed to prove that the consequences of failing to act were patently obvious. *See J.K.J. v. Polk Cnty.*, 960 F.3d 367, 379 (7th Cir. 2020) (citing *Connick v. Thompson*, 563 U.S.

---

[28] Officer Gordon didn't ask Chilcutt whether he had any mental health problems or was suicidal. [63] at 2:20–3:30; *see* [54-1] ¶ 42; [54-10] at 101. But Gordon's isolated failure to follow policy doesn't show the kind of systemic problem that would make constitutional violations an obvious consequence. *Cf. Woodward v. Corr. Medical Services of Illinois, Inc.*, 368 F.3d 917, 927–28 (7th Cir. 2004).

51, 61–62 (2011)) ("[A] failure to act amounts to municipal action for *Monell* purposes only if [a municipality] has notice that its program will cause constitutional violations."). Chilcutt's suicide was the first in decades at the WDP jail. [54-1] ¶ 68. Proof of a single incident of unconstitutional activity isn't enough to impose liability under *Monell*, *see Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 237 (7th Cir. 2021) (citations omitted), and the evidence about WPD's training, policies, and practices doesn't show that constitutional violations were likely to occur because of the City's inaction. In other words, that officers didn't follow WPD policies to the letter and (in Chilcutt's case) may have failed to follow some of their training isn't enough to show institutional culpability. *See Bohanon v. City of Indianapolis*, 46 F.4th 669, 677 (7th Cir. 2022) (quoting *J.K.J.*, 960 F.3d at 380). Based on this record of isolated incidents of insufficient training and failure to follow policies, no jury could conclude that the unconstitutional consequences of the City's inaction were obvious. Plaintiff hasn't identified an action by the City of Waukegan.

Even if plaintiff had shown municipal action, she would also need to show that the City was the moving force behind Chilcutt's injury. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306–07 (7th Cir. 2010); *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405 (1997). Plaintiff argues that Santiago gave Chilcutt a blanket because she wasn't formally trained that blankets could be used for suicide. [54] at 19. But the facts are that Santiago learned about the dangers of blankets during a field training program, [54-14] at 96; *see* [68] ¶ 28, and there's no reason to think that formal training on that point would have made any difference in

35

how Santiago handled Chilcutt's detention. While the version of the detainee screening form in the WPD's general orders included more suicide-specific questions, the form that Gordon used included a question about suicide, and it's not clear (given that Gordon never asked Chilcutt about suicide) why the use of the more detailed form would have made any difference. Similarly, even if the officers had used the detainee condition alert form as WPD policies required, they might not have used that form for Chilcutt, because he didn't exhibit suicidal tendencies (with the exception of a single statement) on October 21, and officers didn't know whether he had any history of mental disorder or defects. The risks of constitutional violations in this case weren't predictable, which means it's also not reasonable to infer that the municipality's inaction led to constitutional violations. *Cf. J.K.J. v. Polk Cnty.*, 960 F.3d 367, 384–85 (7th Cir. 2020) (citation omitted). Plaintiff hasn't shown the direct causal link that *Monell* requires.

Plaintiff hasn't shown either municipal action or causation. Summary judgment is granted to the City of Waukegan.

## IV. Conclusion

The motion for summary judgment, [46], is granted as to officers Pantoja and Gordon and to the City of Waukegan. The motion is denied as to officers Santiago and Tabisz.

ENTER:

Manish S. Shah
United States District Judge

Date: September 26, 2022

36